The Honorable Jerry Hunton State Representative 14221 Greasy Valley Road Prairie Grove, Arkansas 72753
Dear Representative Hunton:
This is in response to your request for an opinion on several questions which are set forth and answered below in the order posed.
 1. If no clear rule or regulation exists for permitting a particular process or portion thereof by ADPCE, what is the proper procedure to follow in order to obtain the permit or permit modification and assurance that others have to comply with the same?
If an activity may not be engaged in without a permit from the Arkansas Pollution Control and Ecology Commission (the "Commission") or the Department of Pollution Control and Ecology (the "Department"), and no rules or regulations of the Commission or Department elaborate upon any permitting procedures set forth in the statutes setting forth the permit requirement, it is my opinion that one should refer to such statutes in determining the proper procedure. Your questions suggest that you are primarily interested in solid waste processing or disposal facilities or disposal sites and, in particular, composting facilities. With respect to solid waste facilities, A.C.A. § 8-6-1601 (as enacted by Act 510 of 1995) provides in part:
 The procedure for issuance of permits for solid waste management systems and for solid waste management disposal sites and facilities shall be as provided in the rules and regulations adopted by the commission under [subchapter 16 of chapter 6 of title 8 of the Arkansas Code] or as otherwise provided by law.
Arkansas Code Annotated § 8-4-203 (Repl. 1993 and as amended by Acts 384 and 895 of 1995) sets forth certain procedures generally applicable to the exercise of the Commission's permitting authority. The Commission's Regulation 8 also applies generally to the permitting process, and the Commission's Regulation 22 contains rules applicable to composting facilities as well as other types of solid waste facilities.
In a highly technical area of the law like pollution control and environmental protection, it is probably neither possible nor desirable that statutory law or a Commission rule addresses each issue that may arise under the Commission's permitting authority. Leaving some discretion to the Commission to determine whether the physical and operational characteristics of a proposed facility allow it to be permitted enables the Commission to employ its own expertise and that of its staff in a flexible manner that accommodates innovation. Aspects of the law that tend to insure that all applicants for permits for similar facilities will face substantially the same process include the provisions of the statutes and rules cited above that govern the permitting process generally and provisions of law that govern appeals of Commission decisions, which may be overturned if they are, among other things, arbitrary, capricious, or characterized by abuse of discretion.See A.C.A. § 8-4-227(d) (as amended by Act 895 of 1995).
 2. What type or types of groundwater protection pads are approved for composting?
 3. Are all types suitable for composting all approved wastes? If not, specifically what type pad for each type of waste?
 4. Is a roof necessary for placement [over] an active compost area? If so, specifically what waste combination[s] need a roof and which ones don't?
Neither the applicable environmental protection statutes administered by the Commission nor the Commission's rules appear to specify what type or types of groundwater protection pads are approved for composting or whether a roof must be placed over any active compost area. In this regard, I have examined in particular, in addition to the statutes administered by the Commission, chapter 8, specifying certain physical characteristics of composting facilities, of the Commission's Regulation 22, governing solid waste management in general. The General Assembly and the Commission apparently deem a case-by-case approach to be preferable to legislation or rulemaking on these subjects. Whatever particular physical components of a waste facility are approved in a given case, they must, at a minimum, be protective of human health and the environment.
 5. Dead bird composting is controlled by livestock and poultry commission. Since other feedstocks are added (i.e. litter, fertilizer, straw and hay, sawdust) how is the composting of these regulated by the commission or does ADPCE regulate them?
Under A.C.A. § 2-40-403 (Cum. Supp. 1993), the Arkansas Livestock and Poultry Commission is required to specify by regulation acceptable methods for the disposal of fowl carcasses. The regulations must include, among other methods, the composting of carcasses. "Fowl carcasses" is defined as "carcasses of fowl which died as the result of sickness, suffocation, accident, or from any cause other than intentional slaughter." A.C.A. § 2-40-401 (Cum. Supp. 1993). A statute adopted as part of the same act that amended A.C.A. § 2-40-403 to provide for disposal by composting provides:
 No provision of [subchapter 4 of chapter 40 of title 2 of the Arkansas Code] shall be interpreted as denying or preempting the regulatory or enforcement jurisdiction of the Arkansas Department of Pollution Control and Ecology.
A.C.A. § 2-40-406 (Cum. Supp. 1993).
Regulations of the Commission set forth several exemptions from the general requirement that composting facilities must be permitted as solid waste facilities. One exemption applies to small facilities composting, among other things, agricultural waste. Another applies to:
 Composting facilities which receive and treat only animal manures, agricultural wastes, yard and other wood wastes if the facility is operated in conjunction with and on the same property as a confined animal facility (Water Division permitting or authorization may be required).
Section 22.803(e)(1) and (3), Commission Regulation 22.
It seems likely that many facilities engaging in the composting of fowl carcasses under rules adopted under A.C.A. § 2-40-403 may be exempt from the Commission permitting requirement under the quoted rule or otherwise. A composting facility that does not come within one of the exemptions, however, will be subject to such requirement, notwithstanding the fact that it is also subject to the regulations of the Arkansas Livestock and Poultry Commission adopted under A.C.A. § 2-40-403. This result is specifically contemplated by A.C.A. § 2-40-406 which, as noted above, preserves the Commission's authority over solid waste disposal.
 6. What is the difference between dead bird composting and composting the parts of dead birds, i.e. poultry sludges, feather and bloodmeal, hatchery waste? I am looking for the technical difference that allows one agency to have jurisdiction over another.
Arkansas Code Annotated § 2-40-403, discussed above in response to your fifth question, is codified in a chapter of the Arkansas Code entitled "Control of Contagious Diseases." Along with the other provision of that chapter, it appears to be concerned primarily with the control of diseases afflicting livestock and poultry, and it applies only to "fowl carcasses" as defined in A.C.A. § 2-40-401(4). The statutes administered by the Commission, on the other hand, are primarily concerned with pollution control and environmental protection. As noted above, a single facility may be subject to both regulatory schemes, and will be unless an exemption from the permitting requirement is available. The Commission apparently has determined that facilities of the types exempted under section 22.801(e) of its Regulation 22 generally do not present a substantial threat of pollution discharge or environmental degradation.
 7. ADPCE regulates "Wet" manure operations like dairys, laying operations and hogs, while not so with dry manure like stock cows, broilers and turkeys. The only difference in the manure is water content. What is the technical reason for regulation of wet and none for dry manures?
I am not aware of the technical reason for which the Commission may regulate facilities producing or handling wet manure (see the Commission's Regulation 5) while not regulating facilities producing or handling dry manure. I assume that either the statutes administered by the Commission contain provisions that cause the Commission to conclude that dry manure is not a substance subject to regulation thereunder, or the Commission has concluded that dry manure does not pose a substantial threat of environmental degradation.
 8. ADPCE is charged with permitting sludges according to 503 Regulations. Metals, bacterial count, Ph and nitrogen are controlled. These same elements are controlled only for municipal sludges, not for poultry sludges. What is the technical reason for the difference?
Part 503 of title 40 of the Code of Federal Regulations contains regulations of the Environmental Protection Agency setting standards for the use or disposal of sewage sludge. "Sewage sludge" is defined in40 C.F.R. § 503.9(w) as "residue generated during the treatment of domestic sewage" and, as such, does not appear to include poultry sludge. I am not aware of the reason why the EPA did not make poultry sludges subject to the standards.
 9. Petroleum hydrocarbons are banned from land application, however most municipal sludges have them present in an amount over 100 ppm. [Whose] responsibility is it to test and make sure that municipal sludges do not contain these in an amount that exceeds 100ppm?
Without further factual information, it is impossible for me to render a definitive opinion on this question. The answer may depend upon the source and nature of the sludge, the identity of the person or entity possessing the sludge, whether the sludge is in bulk or packaged, and the time, place, and manner in which it is proposed to dispose of or process the sludge. As a general proposition, most environmental laws and regulations impose primary compliance responsibility upon the individual or entity generating the waste. Such compliance responsibility may include a duty to test in particular cases.
 10. In the solid waste grant program, can a Solid Waste District avoid the conditions of the grant award, and change the scope of the grant without reporting the changes and fail to comply with the [not] compete with private industry clauses and still receive the grant?
In my opinion, a recipient of a grant under the Solid Waste Management and Recycling Fund Act, A.C.A. §§ 8-6-601 to -611 (Repl. 1993 and as amended by Acts 463 and 511 of 1995), who fails to meet the conditions of a grant set forth in A.C.A. § 8-6-610(b) and the Commission's rules thereunder or modifies the grant project without the approval of the Department, is subject to be ordered by the Department to reimburse all or a portion of the grant proceeds, depending upon when the failure occurred. See A.C.A. § 8-6-610(c). Under the Commission's rules, the Regional Solid Waste Management District Board in whose territory a project receiving grant funds is located is required to oversee the grantee's budget, provide semiannual progress reports, and give notice of irregularities. Section 7, Part III, Commission Regulation 11. The same section provides that grant projects may be modified only with the approval of the Board and the Department, and that grants may be terminated if the Board or the Department determines that the grantee is "unable or unwilling to complete or meet the conditions of the grant as set forth in the grant application."
Your question assumes certain ultimate legal conclusions (i.e., failure to meet the conditions of the grant award and changes in the funded project without notice to the Department) that are determinable only as a question of fact in each particular case. This office is neither equipped nor authorized to make that factual determination. These questions are initially ones for the Department to consider, as it has discretion under the statutes and rules, even if it determines that a failure to comply has occurred, whether to terminate the grant or seek reimbursement in a particular case.
Not having seen the covenant not to compete referred to in your question or the document in which it appears, it is impossible for me to render any opinion with respect to whether a failure to comply with the covenant would constitute a failure to comply with the conditions of a grant or other lawful reason to terminate the grant or order reimbursement.
The foregoing opinion, which I hereby approve, was prepared by Assistant Attorney General J. Madison Barker.
Sincerely,
WINSTON BRYANT Attorney General
WB:JMB/cyh